# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| BRAD LIEBERMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | 1:18 CV 5713 |
| | ) | Hon. Marvin E. Aspen |
| GREGG SCOTT, Program Director, | ) | |
| Rushville Treatment and Detention | ) | |
| Facility, Illinois Department of Human | ) | |
| Services, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINON AND ORDER

MARVIN E. ASPEN, District Judge:

Before us is Petitioner Brad Lieberman's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Pet. (Dkt. No. 1).) For the reasons set forth below, we deny Petitioner's request for habeas relief.

## BACKGROUND

The following facts are taken from the decision of the Illinois Appellate Court, *In re Det. of Lieberman*, 2017 IL App (1st) 160962, 80 N.E.3d 649 (1st Dist. 2017).[1] In 1980, Petitioner was convicted of multiple counts of rape. *Id.* ¶ 2 (quoting *In re Det. of Stanbridge*, 2012 IL 112337, ¶¶ 19–22, 980 N.E.2d 598 (Ill. 2012) (considering Petitioner's earlier appeal to

---

[1] We rely on the Illinois Appellate Court's recitation of facts as the last state court to consider Petitioner's claims on the merits. *Boyd v. Boughton*, 798 F.3d 490, 492 (7th Cir. 2015); *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003). Facts taken from the state court decision are presumed to be correct unless the petitioner meets his "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

the Illinois Supreme Court in a consolidated case)). He was sentenced to concurrent terms of imprisonment. *Id.* Before his scheduled release in 2000, Petitioner was involuntarily committed to the Illinois Department of Human Services (the "Department") pursuant to the Illinois Sexually Violent Persons Commitment Act (the "Act"), 725 ILCS 207/1 *et seq.*[2] *Id.* In February 2006, a jury found Petitioner to be a sexually violent person under the Act. *Id.* At the time, the diagnosis forming the basis of Petitioner's commitment was a mental disorder called paraphilia, not otherwise specified, sexually attracted to nonconsenting persons ("PNOS"). *Id.*

After a person is committed, the Department must submit a written report on the person's condition at least once every twelve months to determine whether "(1) the person has made sufficient progress in treatment to be conditionally released and (2) the person's condition has so changed since the most recent periodic examination (or initial commitment, if there has not yet been a periodic reexamination) that he or she is no longer a sexually violent person." 725 ILCS 207/55(a).

The Department performed the requisite annual evaluations and produced yearly reports on Petitioner's condition. *Lieberman*, 2017 IL App (1st) 160962 at ¶ 3. From 2007 to 2012, evaluators determined that Petitioner continued to suffer from PNOS. (Pet'r's Exs. 16–21 (Dkt. No. 3–2 at PageID #:367–487; Dkt. No. 3–3 at PageID #:488–505).)

In 2013, Petitioner's diagnosis changed. (Pet'r's Ex. 1 (Dkt. No. 3–2 at PageID #:40–53).) Dr. Kimberly Weitl prepared the 2013 reexamination report. *Lieberman*,

---

[2] As relevant here, the Act defines "sexually violent person" as "a person who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f). The Act further defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* 207/5(b).

2017 IL App (1st) 160962 at ¶ 5.  Petitioner refused an interview with Dr. Weitl for the

reexamination.  *Id.*  Based on Petitioner's criminal history and Petitioner's history of disciplinary

issues in prison, Dr. Weitl found, using the Diagnostic and Statistical Manual of Mental

Disorders ("DSM"), that Petitioner met the diagnoses of sexual sadism and antisocial personality

disorder.  *Id.* ¶¶ 6–8.

> Dr. Weitl explained that sexual sadism "is a paraphilia disorder that involves
> inflicting physical or psychological pain and suffering on a non-consenting person
> during a sexual act."  Dr. Weitl noted that [Petitioner] was "formerly diagnosed
> with Paraphilia Not Otherwise Specified, Non-Consent, but using the newly
> released fifth edition of the DSM it is clear that he meets the diagnosis for Sexual
> Sadism." . . . She further stated that sexual sadism was "considered a mental
> disorder under the [A]ct."

*Id.* ¶ 8.  Dr. Weitl determined that "[a]s a result of [Petitioner's] mental disorder(s), it is

substantially probable that (he) will engage in acts of sexual violence," that he "should continue

to be found a Sexually Violent Person," and that he "should remain committed to the Illinois

Department of Human Services–Treatment and Detention Facility" for further care.  *Id.* ¶ 11.

Based on Dr. Weitl's report, the State of Illinois ("State") on March 19, 2014 filed a motion for a

finding that no probable cause existed to conclude that Petitioner was no longer a sexually

violent person under the Act.  *Id.* ¶ 4.

On July 9, 2014, Petitioner filed a petition for discharge claiming that he was entitled to

release because of his change of diagnosis from PNOS to sexual sadism.  *Id.* ¶ 12.  Petitioner

also argued that his civil commitment based on sexual sadism violated his due process rights.  *Id.*

The State argued that it was Petitioner's burden to show that he was no longer sexually violent

and his challenge to his new diagnosis did not meet that burden.  *Id.* ¶ 13.  The State also argued

that due process does not require a new trial when an evaluator determines a person remains

sexually violent under a different diagnosis.  *Id.*

On November 14, 2014, the trial court ordered discovery regarding the significance of the

new diagnosis. *Id.* ¶ 14. During her deposition, Dr. Weitl

> testified that nothing in [Petitioner]'s condition or behavior had changed since the
> most recent prior reexamination, and aside from the version of the DSM, the
> documents she used in making her diagnoses were the same. . . .
>
> What had changed, however, was an addition to the DSM-5 sexual sadism
> "Diagnostic Features," which instructed that "[t]he diagnostic criteria for sexual
> sadism disorder are intended to apply both to individuals who freely admit to
> having such paraphilic interests and to those that deny any sexual interest in the
> physical or psychological suffering of another individual despite substantial
> objective evidence to the contrary." Dr. Weitl explained that prior to this addition,
> she was not able to diagnose [Petitioner] with sexual sadism under the DSM IV-TR
> because the diagnostic criteria required her to know respondent's motive for
> engaging in the violent behavior, specifically that the victim's suffering was
> "sexually exciting" to respondent. . . . [O]nce the DSM-5 was released and
> explicitly directed that the disorder could be diagnosed where the person denied
> such interest "despite substantial objective evidence to the contrary," Dr. Weitl
> believed that sexual sadism "better describe[d]" respondent's behavior and mental
> disorder.
>
> When asked whether PNOS and sexual sadism were different mental disorders,
> Dr. Weitl explained that "a yes or no question" was not appropriate. She testified
> that she was "telling the truth" when she had previously diagnosed him with
> PNOS, but based on the new version of the DSM, she concluded that [Petitioner]
> "still has a Paraphilia" but his paraphilia was no longer "Not Otherwise Specified"
> and instead was now "specified by Sexual Sadism." When questioned about
> whether [Petitioner] no longer has PNOS, or whether he could still be diagnosed
> with PNOS, Dr. Weitl testified that PNOS could ''still describe his behavior'' and
> that "he is still attracted to non-consenting victims." Dr. Weitl testified that she
> "would not say that he doesn't" have PNOS, but she believed that the sexual
> sadism diagnosis better described his behavior based on the instructions of the new
> DSM.
>
> Dr. Weitl further testified that paraphilic disorders, including PNOS and Sexual
> Sadism, are "chronic, lifelong disorders" that do not go away but can be managed
> with treatment. [Petitioner], however, had refused to participate in any such
> treatment.

*Id.* ¶¶ 15–18. Although Petitioner maintained that he should be discharged because his civil

commitment was based on a PNOS diagnosis, the State reiterated that it was Petitioner's burden

to show he no longer had a mental disorder or was no longer substantially likely to engage in acts

of sexual violence. *Id.* ¶¶ 19, 21. The trial court agreed with the State's position and granted its motion finding that no probable cause existed to warrant discharge and denied Petitioner's motion for discharge. *Id.* ¶ 22.

Petitioner appealed the trial court's decision claiming that the court violated his due process rights because it erred in finding no probable cause to warrant his discharge. *Id.* ¶ 25. The Illinois Appellate Court upheld the trial court's decision and found no merit to Petitioner's constitutional contentions because all the evidence before the trial court indicated that Petitioner continued to suffer from a mental disorder and that he would be substantially probable to reoffend if released. *Id.* ¶¶ 47, 62–64.

In state court, Petitioner also alleged the State prevented him from using the 2013 reexamination report in proceedings related to his 2011 and 2012 reexaminations and therefore committed a violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). *Lieberman*, 2017 IL App (1st) 160962 at ¶ 55. The appellate court rejected this argument, stating that Petitioner did not provide authority that *Brady* applies to civil proceedings pursuant to the Act. *Id.* ¶ 58. Even if *Brady* did apply, the appellate court found Petitioner would not be afforded relief in any event because Dr. Weitl's reexamination report was not favorable to him, exculpatory, or prejudicial. *Id.* ¶¶ 58–59.

On July 6, 2017, Petitioner filed a Petition for Leave to Appeal to the Illinois Supreme Court to reverse the appellate court's decision allowing Petitioner's civil commitment to continue. (Dkt. No. 10). The Illinois Supreme Court denied Petitioner's petition for discharge. *Id.* The present petition followed. (Pet.)

## LEGAL STANDARD

We are empowered to grant a writ of habeas corpus only if Petitioner is imprisoned "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 480 (1991). Federal habeas relief may be granted to a petitioner who can establish that the state court's adjudication of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or where the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Under § 2254(d)(1), the "contrary to" and "unreasonable application" clauses are given independent meaning. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000). A state court decision is "contrary to" established Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." *Id.*

A state court decision is "an unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or if the state court "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The reasonableness inquiry "is quite deferential, such that a state decision may stand so long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005).

"Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)). A state court's factual determinations are presumed correct, and the burden rests upon the petitioner to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[3]

## ANALYSIS

Petitioner asserts three bases for habeas relief. First, Petitioner contends that his continued confinement after the change in his diagnosis from PNOS to sexual sadism in 2013 violates his right to due process under the U.S. Constitution. (Pet. ¶¶ 30–34.) Second, Petitioner claims the state appellate court unreasonably determined the facts surrounding his changed diagnosis in light of the evidence presented in state court. (*Id.* ¶¶ 35–38.) Third, Petitioner argues that the State withheld the 2013 report that changed his diagnosis during prior proceedings challenging his PNOS diagnosis, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194. (*Id.* ¶¶ 39–40.) We consider Petitioner's first two claims concerning his change in diagnosis together, followed by the third claim regarding the withheld report.

## I. PETITIONER'S CHANGED DIAGNOSIS

Petitioner argues that his continued confinement based on a new diagnosis of sexual sadism fails to meet the due process standard of civil commitment articulated in *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072 (1997), and *Foucha v. Louisiana*,

---

[3] Before addressing the merits of this habeas petition, we observe that the parties do not dispute that Petitioner has exhausted his state court remedies and has not procedurally defaulted on his claims. *See Moore v. Parke*, 148 F.3d 705, 708 (7th Cir. 1998); *Bocian v. Godinez*, 101 F.3d 465, 468 (7th Cir. 1996).

504 U.S. 71, 112 S. Ct. 1780 (1992), and that the Illinois Appellate Court's decision upholding

his confinement is thus contrary to and an unreasonable application of clearly established

Supreme Court precedent under 28 U.S.C. § 2254(d)(1). (Pet. ¶¶ 30–34; Mem. (Dkt. No. 3) at

13–18.) Petitioner further argues that the state court unreasonably determined the facts of his

mental disorder in light of the evidence presented, making his confinement illegal under

28 U.S.C. § 2254(d)(2). (Mem. at 19–21.) We analyze each ground in turn.

### A.    The State Court Did Not Act Contrary to or Unreasonably Apply Clearly Established Law

Petitioner argues that by abandoning his PNOS diagnosis in 2013, the State "nullified the

factual and legal underpinning of Mr. Lieberman's civil commitment," and that his due process

rights have been violated because no factfinder has ratified Dr. Weitl's new diagnosis of sexual

sadism. (Mem. at 15–17.) Respondent contends that Petitioner's claim fails because there is no

clearly established Supreme Court precedent or other federal law defining the due process

standard for post-commitment determinations. (Resp. (Dkt. No. 12) at 5–7.)

The Supreme Court has upheld involuntary commitment "provided the confinement takes

place pursuant to proper procedures and evidentiary standards." *Hendricks*, 521 U.S. at 357,

117 S. Ct. at 2080. Ordinarily, a finding of dangerousness alone is insufficient to justify

involuntary commitment. *Id.* at 358, 117 S. Ct. at 2080. Instead, the Supreme Court has

"sustained civil commitment statutes when they have coupled proof of dangerousness with the

proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* Due

process permits the state to confine an individual under civil commitment statutes "as long as he

is both mentally ill and dangerous, but no longer." *Foucha*, 504 U.S. at 77, 112 S. Ct. at 1784;

*accord Jones v. United States*, 463 U.S. 354, 362, 103 S. Ct. 3043, 3048 (1983) ("[T]he Due

Process Clause requires the Government in a civil-commitment proceeding to demonstrate by

clear and convincing evidence that the individual is mentally ill and dangerous." (citing *Addington v. Texas*, 441 U.S. 418, 426–27, 99 S. Ct. 1804, 1809–10 (1979))).

The Supreme Court has been highly deferential to states on the due process required to ascertain mental illness in the civil commitment context. In doing so, the Court has recognized the uncertainties inherent in psychiatric and medical diagnosis. To meet due process standards in an initial involuntary commitment proceeding, the Court has held that a factfinder must find by "clear and convincing" evidence that a potential committee is mentally ill. *Addington*, 441 U.S. at 433, 99 S. Ct. at 1813. The Court stated, however, that "determination of the precise burden[, which must be] equal to or greater than the 'clear and convincing' standard[,] . . . is a matter of state law" reserved to state supreme courts. *Id.* In rejecting the higher, beyond-reasonable-doubt burden of proof as the constitutional minimum, the Court observed the vagaries of psychiatric diagnosis:

> Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. . . . The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. . . . Psychiatric diagnosis . . . is to a large extent based on medical "impressions" drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient.

*Id.* at 429–30, 99 S. Ct. at 1811; *see also Jones*, 463 U.S. at 370, 103 S. Ct. 3053 ("We have observed before that '[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.'" (quoting *Marshall v. United States*, 414 U.S. 417, 427, 94 S. Ct. 700, 706 (1974)). In *Hendricks*, which forms a pillar of Petitioner's due process claim, the Court expressly "recognize[d] . . . that psychiatric professionals are not in complete harmony casting . . . paraphilias in general, as 'mental illnesses.' . . . These disagreements, however, do

not tie the State's hands . . . .  In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes." *Hendricks*, 521 U.S. at 360 n.3, 117 S. Ct. at 2081 n.3.  In that case, the Court found that "[t]he mental health professionals who evaluated Hendricks diagnosed him as suffering from pedophilia," and his "diagnosis as a pedophile . . . plainly suffices for due process purposes." *Id.* at 360, 117 S. Ct. at 2081.

The Court's pronouncements on the due process requirements for continued involuntary commitment—after the initial commitment determination—are even more spare.  To be sure, the Court has unequivocally "held as a matter of due process that it [is] unconstitutional for a State to continue to confine a harmless, mentally ill person.  Even if the initial commitment was permissible, it c[annot] constitutionally continue after that basis no longer exist[s]." *Foucha*, 504 U.S. at 77, 112 S. Ct. at 1784 (quotations omitted).  Just so, one who is no longer mentally ill cannot be held in involuntary civil commitment.  *Id.* at 78, 112 S. Ct. at 1784.  As Justice O'Connor clarified in a controlling partial concurrence, "it [is] clear that [insanity] acquittees could not be confined as mental patients absent some medical justification for doing so; in such a case the necessary connection between the nature and purposes of confinement would be absent." *Id.* at 88, 112 S. Ct. at 1790 (O'Connor, J., concurring in part and concurring in the judgment).  However, the Court has gone no further in defining the constitutional minimum for continued confinement.

Here, Petitioner was found to be both dangerous and mentally ill by a jury beyond a reasonable doubt, higher than the constitutional minimum required for initial involuntary civil commitment. *Lieberman*, 2017 IL App (1st) 160962 at ¶ 2; 725 ILCS 207/35 (requiring State to prove beyond a reasonable doubt that an individual is a sexually violent person);

725 ILCS 207/5(f) (defining sexually violent person as one "who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence"); *Addington*, 441 U.S. at 433, 99 S. Ct. at 1813. Since his initial commitment, Petitioner has repeatedly been found to have a mental disorder that predisposes him to commit acts of sexual violence. (Pet'r's Exs. 16–21 (diagnosing Petitioner with PNOS from 2007 through 2012); Pet'r's Exs. 1–5 (Dkt. No. 3–2 at PageID #:37–125) (diagnosing Petitioner with sexual sadism from 2013 through 2017).) *See also* 725 ILCS 205/55(a) (requiring annual reexaminations).

The trial court considering Petitioner's challenge to his change in diagnosis found that Petitioner gave no evidence that he no longer had a mental disorder, which is his burden under the Act. (Pet'r's Ex. 7 (Dkt. No. 3–2 at PageID #: 162–63) ("[T]he fact is that all the testimony before this Court is that the condition that he had . . . doesn't go away with time, that in the . . . 16 years he's been in the Department, he's not had a lick of treatment and that there's nothing to indicate that he's no longer sexually dangerous . . . .").) The appellate court, denying Petitioner's due process challenge, likewise concluded that the jury that initially committed Petitioner

> found that [Petitioner] suffered from a mental disorder. It did not find that [Petitioner] suffered from PNOS or any other specific mental disorder. Dr. Weitl testified that [Petitioner] continues to have a mental disorder and he continues to be dangerous. There is nothing inconsistent in that testimony from the jury's verdict, and [Petitioner] presented no evidence conflicting with Dr. Weitl's testimony on those issues. All evidence before the trial court indicated that [Petitioner] continues to suffer from a mental disorder and that he would be substantially probable to reoffend if released.

*Lieberman*, 2017 IL App (1st) 160962 at ¶ 47.

The Illinois Appellate Court correctly identified the governing Supreme Court precedent in determining whether Petitioner's continued confinement comported with due process. *Lieberman*, 2017 IL App (1st) 160962 at ¶ 46 (citing and applying *Foucha*). As such,

Petitioner's claim does not "fit comfortably within [28 U.S.C.] § 2254(d)(1)'s 'contrary to' clause" because the "state-court decision appl[ied] the correct legal rule from [Supreme Court] cases to the facts of [Petitioner's] case." *Williams*, 529 U.S. at 406, 120 S. Ct. at 1520.  The appellate court's decision on Petitioner's due process claim is therefore not "contrary to" clearly established law.

Moreover, the appellate court was not unreasonable, under governing Supreme Court precedent, in rejecting Petitioner's due process claim.  As stated, to the degree there is any clearly established federal law in this area, the Supreme Court has been highly deferential to states' legal determination of what constitutes medical illness sufficient to justify commitment. *Hendricks*, 521 U.S. at 360, 117 S. Ct. at 208; *Addington*, 441 at 429–30, 99 S. Ct. at 1811; *see also Jones*, 463 U.S. at 364 n.13, 103 S. Ct. at 3030 n.13 ("The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment . . . ." (quoting *Greenwood v. United States*, 350 U.S. 366, 375, 76 S. Ct. 410, 415 (1956)).  Dr. Weitl testified as to her diagnostic reasoning in Petitioner's case. (*See* Pet'r's Ex. 23 (Dkt. No. 3–3 at PageID #:525–718) ("Weitl Dep.").).  *Lieberman*, 2017 IL App (1st) 160962 at ¶¶ 15–18.  She recounted that despite the change in diagnosis from PNOS to sexual sadism, the underlying facts of Petitioner's condition, which formed the basis of both diagnoses, had not changed.  *Id.* ¶ 15.  The only difference between the 2012 and 2013 reexaminations was the "Diagnostic Features" in the newly available DSM-5 that, in Dr. Weitl's opinion, allowed a more accurate diagnosis of sexual sadism.  *Id.* ¶ 16.  Dr. Weitl further stated that sexual sadism, in the category of paraphilic disorders, are "chronic, lifelong disorders" that cannot be cured but can be managed with treatment.  *Id.* ¶ 18.  Petitioner has refused any treatment for either PNOS or sexual sadism.  *Id.*  Under these circumstances, we see no argument

that the state courts "unreasonably applied" clearly established federal law by upholding Petitioner's confinement under his new diagnosis. *See* 28 U.S.C. ¶ 2254(d)(1).

Petitioner relies heavily on *Foucha*, 504 U.S. 71, 112 S. Ct. 1780, but that case does not provide a foundation for relief. (Mem. at 15–18; Reply (Dkt. No. 20) at 2.) In *Foucha*, the State did not claim that the petitioner was presently mentally ill, and under those conditions, the Supreme Court held that he could no longer be confined to a mental institution. *Foucha*, 504 U.S. at 80, 112 S. Ct. at 1786. That is not the case here. Petitioner did not then, and does not now, argue that he no longer suffers from a mental disorder that predisposes him to sexual violence. It is undeniable that Petitioner's involuntary commitment could not continue were he to show he no longer had such a condition. As it stands, however, Petitioner offers no such argument, and challenges only the standard by which the state courts determined he continues to suffer from a mental disorder. Neither *Foucha* nor *Hendricks*, nor any other Supreme Court case, offers clear guidance that the state courts unreasonably applied. To the extent the Supreme Court has given any guidance at all, the state courts fell within reasonable bounds.

Petitioner claims that upholding his confinement would allow the State to change diagnoses of civil committees at will, unmoored from medical science or the dictates of due process. (Mem. at 17–18.) Under the appellate court's reasoning, Petitioner contends, "Once a jury finds that Mr. Lieberman is a sexually violent person, his ongoing commitment is justified by an evaluator's opinion that he has *any* mental disorder, be it sexual sadism, pedophilia, or even schizophrenia, regardless of what evidence was presented to the jury." (*Id.* at 17.)

Petitioner's concern would be legitimate if that were the holding of the appellate court. But the appellate court did not grant the State *carte blanche* to change diagnoses at will, regardless of whether the new diagnosis bore a reasonable relation to adjudicated justifications

for the individual's involuntary commitment. The court grounded its analysis in the text of the Act, which requires annual reexaminations to determine if the committed person's "condition has so changed since the most recent periodic reexamination . . . that he or she is no longer a sexually violent person." *Lieberman*, 2017 IL App (1st) 160962 ¶ 49 (quoting 725 ILCS 207/55(a)). The court concluded that the Act *had to* allow for new diagnoses, or else the State would be dissuaded from "gaining a better understanding of that person's condition" through time. *Id.* A change in diagnosis, however, is not always a change in "condition" that would affect a person's civil commitment. *Id.* Under the circumstances of this case, the appellate court found that the new diagnosis was substantially related to the old diagnosis because all the underlying facts of Petitioner's condition remained the same. *Id.* ¶¶ 44, 45, 49. This is all that due process requires. *Foucha*, 504 U.S. at 79, 112 S. Ct. at 1785 ("Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.").

Should the facts of Petitioner's case change such that his diagnosis no longer bears a reasonable relation to his underlying condition or reasons for confinement, due process offers a mechanism for relief. As the Seventh Circuit has stated, although "states must have appropriate room to make practical, common-sense judgments about the evidence presented in commitment proceedings," courts must be "mindful of Justice Kennedy's admonition [in *Hendricks*] that if a state's mental health predicate for civil commitment becomes 'too imprecise a category,' it may run afoul of the Constitution." *McGee v. Bartow*, 593 F.3d 556, 580–81 (7th Cir. 2010) (quoting *Hendricks*, 521 U.S. at 373, 117 S. Ct. at 2087 (Kennedy, J., concurring)). Nothing in the appellate court's decision crossed this constitutional line. Accordingly, we deny Petitioner relief on this ground.

## B. The State Court Did Not Unreasonably Determine Facts in Light of the Evidence Presented

Petitioner further contends that the state court unreasonably determined the facts in light of the evidence presented, warranting relief under 28 U.S.C. § 2254(d)(2). (Pet. ¶¶ 35–38; Mem. at 19–21.)[4] "[A] decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy*, 604 F.3d at 399. State-court factual determinations are presumed correct, and it is Petitioner's burden to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner first argues that the Illinois Appellate Court improperly determined that the 2006 jury trial resulting in Petitioner's initial commitment supports his continued commitment under a new diagnosis. (Mem. at 19.) Because the jury heard evidence only that Petitioner has PNOS and antisocial personally disorder, and not sexual sadism, Petitioner contends "[t]here is no factual basis supporting the Appellate Court's determination that the requirement that civil commitment requires proof of '*a* "mental illness" or "mental abnormality"' has been met with respect to Sexual Sadism." (*Id.* (quoting *Hendricks*, 521 U.S. at 538, 117 S. Ct. at 2080).)

The state appellate court concluded that the jury was asked to find only whether Petitioner suffered from "a mental disorder. They were not asked specifically whether he suffered from PNOS or any other particular disorder." *Lieberman*, 2017 IL App (1st) 160962 at ¶ 35. The court thus saw "nothing inconsistent" between Dr. Weitl's testimony that Petitioner

---

[4] Petitioner attacks the State's justifications for Petitioner's diagnosis throughout the life of his civil commitment case. (*See* Reply at 6–9.) Whatever the State's justifications, our review is limited to whether the state *court* unreasonably determined facts in light of the evidence available to it. *See* 28 U.S.C. 2254(d)(2) (habeas may only be granted if state adjudication "resulted in a *decision*" based on unreasonable factual determination "in light of the evidence presented in the *State court proceeding*" (emphasis added)); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018) ("[W]e may grant relief [under 28 U.S.C. § 2254(d)(2)] if a *state court's decision* . . . rested on an unreasonable factual determination." (emphasis added)).

suffered from sexual sadism and the jury's finding that Petitioner had a mental disorder. *Id.* ¶ 47. Furthermore, the appellate court determined that "[a]ll evidence before the trial court [after the change in diagnosis to sexual sadism] indicated that [Petitioner] continues to suffer from a mental disorder and that he would be substantially probable to reoffend if released." *Id.*

Petitioner has submitted no evidence suggesting that the jury in Petitioner's 2006 trial was asked to find, or found, that Petitioner suffered from PNOS or another specific mental disorder as opposed to a mental disorder generally. The only excerpts of the 2006 trial that Petitioner attached to his petition indicate that the jury heard evidence that Petitioner had PNOS and antisocial personality disorder. (Pet'r's Ex. 14 (Dkt. No. 3–2) at PageID #:348–49, 355–58.) None of the attached transcripts show what the jury was asked to find or what the jury stated in rendering a verdict. As such, Petitioner has failed to rebut by clear and convincing evidence the appellate court's conclusion that the jury found only that Petitioner had *a* mental illness, rather than the specific diagnosis of PNOS or any other disorder. 28 U.S.C. 2254(e)(1).[5]

Petitioner next argues that the Illinois Appellate Court acted unreasonably in crediting Dr. Weitl's diagnostic reasoning. (Mem. at 20.) Petitioner contends that Dr. Weitl repeatedly contradicted her justifications for changing Petitioner's diagnosis in deposition testimony, that her diagnosis is unsupported by medical science, that she contradicted prior testimony she gave

---

[5] In any event, the Supreme Court has never required the finding of a specific diagnosis to justify civil commitment. The Court has only required that proof of dangerousness be coupled with "proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Hendricks*, 521 U.S. at 538, 117 S. Ct. at 2080. Indeed, the Court has expressly stated that "the term 'mental illness' is devoid of any talismanic significance. Not only do psychiatrists disagree widely and frequently on what constitutes mental illness, but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement." *Id.* at 359, 117 S. Ct. at 2080 (citations and quotations omitted).

before the state trial court, and that she did not attempt to contact Petitioner in the evaluation that resulted in the change in his diagnosis.  (*Id.* at 20–21.)

A brief review of the evidence that was before the Illinois trial and appellate courts will aid our analysis.  The evidence included Dr. Weitl's 2013 reexamination report, which changed Petitioner's diagnosis from PNOS to sexual sadism, (Pet'r's Ex. 1), and Dr. Weitl's deposition regarding the changed diagnosis, (Weitl Dep.).  In addition, Petitioner submitted two declarations of Dr. Michael B. First, an editor of the DSM and professor of clinical psychiatry at Columbia University, further defining the distinctions between PNOS and sexual sadism and challenging Dr. Weitl's reading of the DSM.   (First Decl. (Dkt. No. 3–2 at PageID #:360–66); First Decl. Addendum (Dkt. No. 3–3 at PageID #:790–91).)

Dr. Weitl's 2013 reexamination report explains that her change in diagnosis from PNOS to sexual sadism derives from her reading of the DSM-5.  (*See* Pet'r's Ex. 1 at PageID #:46 ("Mr. Lieberman was formerly diagnosed with Paraphilia Not Otherwise Specified, Non-Consent, but using the newly released fifth edition of the DSM it is clear that he meets the diagnosis for Sexual Sadism.").)  Dr. Weitl repeatedly and consistently explains in her deposition that she interpreted the DSM-5 as allowing her to infer the source of Petitioner's sexual arousal from objective behaviors, instead of requiring Petitioner to self-report the focus of his arousal, which in turn allowed a diagnosis of sexual sadism.  (*E.g.*, Weitl Dep. at PageID #:593 ("Q: And it is your testimony here today that the exclusive reason for the change in that [diagnostic] opinion is because of the change in the DSM-5?  A: That's right."); *id.* at PageID #:612 ("Q: . . . [N]ow that . . . the DSM-5 has come out, it's your belief that he has Sexual Sadism.  A: Yes, he meets that criteria now."); *id.* at 654–55 (explaining that in Dr. Weitl's opinion the DSM IV-TR did not allow inferences of sexual arousal from others' pain without express admission, while the

DSM-5 allowed that inference from objective behavioral evidence); *id.* at PageID #:667 (explaining that Dr. Weitl did not feel comfortable diagnosing Petitioner with sexual sadism until the DSM-5 was released).)

Although Dr. First disagrees with Dr. Weitl's hesitancy to infer the focus of Petitioner's arousal under the DSM IV-TR, (First Decl. ¶¶ 18–19), Dr. First clarifies in his second declaration that there is more overlap in the diagnoses than Petitioner's briefs suggest. He states:

> If the examiner judges that the focus of the sexual fantasies, urges, and behaviors is physical or psychological suffering, then the paraphilia Sexual Sadism is diagnosed. If the paraphilic focus is on something other than those covered by the eight paraphilias included in the DSM, the diagnosis of Paraphilia NOS is given with the option of indicating what the paraphilic focus is, in this case "non-consent."

(First Decl. Addendum ¶ 3.) Dr. Weitl, while recognizing that PNOS and sexual sadism are distinct disorders, explains in her deposition that she judged the focus of Petitioner's sexual arousal differently based exclusively on the DSM-5, which is at least arguably consistent with Dr. First's description of the two disorders. (*See* Weitl Dep. at PageID #:621, 629, 648, 654–55, 667.) More to the point, Dr. Weitl testified that nothing about the underlying facts of Petitioner's behavior or condition had changed; the only change was how Dr. Weitl matched those underlying facts to what she believed to be the best-fitting diagnosis in the latest version of the DSM. (*Id.* at PageID #:591 ("Nothing in his condition has changed."); *id.* at PageID #:612–13 ("Sexual Sadism better describes his behavior. I don't know that PNOS doesn't still describe his behavior, his victims are still non-consenting, but sadism better describes it. . . . Q: But the behavior hasn't changed, right? The act still occurred in 1979 and 1980. A: Right . . . . Nothing's changed.").)

With this backdrop, the record before us shows that the Illinois Appellate Court did not "ignore[] the clear and convincing weight of the evidence" in crediting Dr. Weitl's reports and

testimony.  *Goudy*, 604 F.3d at 399.  The appellate court reasoned, based on the evidence before it, that Petitioner's "diagnosis has changed based on an update to the DSM, which, according to Dr. Weitl, allowed [Petitioner's] mental condition to be better described by a sexual sadism diagnosis.  However, his 'underlying symptoms or mental conditions have remained consistent and not changed.'"  *Lieberman*, 2017 IL App (1st) 160962 at ¶ 44 (quoting *In re Detention of Sease*, 190 Wash. App. 29, 357 P.3d 1088, 1097 (2015)).  Moreover, Petitioner submitted no evidence before the state courts—or this Court—suggesting that Petitioner no longer has a mental disorder predisposing him to acts of sexual violence.  *See id.* at ¶ 45.  Based on our review of the evidence, we cannot say that the Appellate Court made an "unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).[6]  We therefore deny habeas relief under § 2254(d)(2).

---

[6] Two other factual disputes warrant mention.  First, Petitioner claims that there is no evidence that Dr. Weitl attempted to contact him to perform her 2013 reexamination. (Mem. at 21.)  In support, Petitioner submits a Freedom of Information Act response with what appear to be visitor logs of Petitioner's facility on the date of Dr. Weitl's visit. (Pet'r's Ex. 24 (Dkt. No. 3–3 at PageID #:720–22).)  As Dr. Weitl's name does not appear on this page, Petitioner contends she never actually visited the facility. (Mem. at 21.)  Dr. Weitl directly challenged that assertion in her deposition, stating that she went to Petitioner's facility on the appointed date, and that the log sheet Petitioner produced did not look like the sheet she typically signs to gain access and appeared to be incomplete. (Weitl Dep. at PageID #:547–49, 715.)  There was thus evidence in the record from which the appellate court could conclude that Dr. Weitl visited Petitioner's facility when she said she did, and Petitioner has not disproven that determination by clear and convincing evidence.  Second, Petitioner states that Dr. Weitl contradicted her prior testimony before the Illinois courts when she stated, in April 2013, that Petitioner did *not* have sexual sadism. (Mem. at 20.)  Dr. Weitl explains in her deposition that when she gave the prior testimony, the DSM-5, on which went she based Petitioner's sexual sadism diagnosis, had not yet been released. (Weitl Dep. at PageID #:593–94.)  The new version of the DSM was released in May 2013, after her April 2013 testimony. (*Id.*)  Here again, Petitioner has not rebutted any state court factual conclusions of Dr. Weitl's credibility by clear and convincing evidence.

## II.    WITHHELD REPORT

Petitioner's final claim for relief is that his due process rights were violated when the State withheld Dr. Weitl's 2013 reexamination report while Petitioner's motion for discharge on his previous PNOS diagnosis was ongoing before the state courts.  Petitioner argues that this amounts to the State intentionally withholding exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194.  (Pet. at ¶¶ 39–40; Mem. at 18–19.) Respondent contends that the Supreme Court never held *Brady* to extend to civil cases, as proceedings to commit sexually violent persons have been classified.  (Resp. at 9.)

The Supreme Court in *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196–97.  The Court has enumerated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999).

The Illinois Appellate Court in reviewing this claim first remarked that Petitioner had not provided any authority supporting application of *Brady* in the civil commitment context. *Lieberman*, 2017 IL App (1st) 160962 at ¶ 58; *see In re Det. of Samuelson*, 189 Ill. 2d 548, 559, 727 N.E.2d 228, 235 (Ill. 2000) ("[P]roceedings under the Sexually Violent Persons Commitment Act are civil rather than criminal in nature.").  However, even assuming *Brady* to apply, the appellate court found it would not afford Petitioner relief because Dr. Weitl's 2013 reexamination report was not helpful to Petitioner.  *Lieberman*, 2017 IL App (1st) 160962 ¶ 59

("The change in diagnosis in this case was not exculpatory or impeaching because it did not establish a change in circumstances relevant to his prior adjudication as a sexually violent person."). Accordingly, the appellate court reasoned that Petitioner suffered no prejudice because the outcome of Petitioner's ongoing commitment proceedings would not have been affected had the report been available earlier. *Id.*

Petitioner argues before this Court that the liberty interest implicated in involuntary confinement is of sufficient constitutional magnitude to warrant *Brady* protection in the civil commitment context. (Mem. at 18; Reply at 9–11.) Petitioner cites in support a Fourth Circuit case that speaks approvingly of a district court opinion that held the *Brady* rule to apply in federal civil commitment proceedings for sexually dangerous persons. (Reply at 10 (*United States v. Searcy*, 880 F.3d 116, 125 (4th Cir. 2018) (approvingly citing *United States v. Edwards*, 777 F. Supp. 2d 985, 990, 998 (E.D.N.C. 2011))).)

Undeniably, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington*, 441 U.S. at 425, 99 S. Ct. at 1809. However, we need not decide whether *Brady* might apply to civil commitment of Petitioner's type because our review under 28 U.S.C. § 2254(d) is limited to whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *McGee*, 593 F.3d at 571–72 (quoting § 2254(d)(1)). Petitioner has produced no Supreme Court precedent clearly establishing that *Brady* applies to civil commitment, and the Illinois Appellate Court observed as much in rejecting Petitioner's claim. *Lieberman*, 2017 IL App (1st) 160962 at ¶ 58. The case Petitioner submits from the Fourth Circuit is unavailing, not only because it does not bind this Court, but also because "circuit precedent does not constitute 'clearly established Federal law, as

determined by the Supreme Court.'" *Glebe v. Frost*, 574 U.S. 21, 135 S. Ct. 429, 431 (2014).

Because the Supreme Court has given "no clear answer to the question presented . . . it cannot be

said that the state court unreasonabl[y] appli[ed] clearly established Federal law." *Wright v. Van*

*Patten*, 552 U.S. 120, 126, 128 S. Ct. 743, 747 (2008) (quotations omitted).

Accordingly, we deny habeas relief on this ground.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner intends to appeal this decision, we decline to issue a certificate of

appealability ("COA"). Pursuant to 28 U.S.C. § 2253(c)(1), a COA is required for an appeal

from a final order in a habeas corpus proceeding under 28 U.S.C. § 2254. We may grant a COA

"only if the applicant has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2); *see also Walker v. O'Brien*, 216 F.3d 626, 631-32 (7th Cir. 2000). To

show that his constitutional rights have been denied, "[t]he petitioner must demonstrate that

reasonable jurists would find the district court's assessments of the constitutional claims

debatable or wrong," or that "the issues presented were 'adequate to deserve encouragement to

proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1603–04 (2000)

(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S. Ct. 3383, 3395 (1983)).

Here, we determine that reasonable jurists would not debate our conclusions with respect

to Petitioner's claims. As addressed above, due process permits the State to continue to confine

an individual as long as he is both mentally ill and dangerous, and the purpose for his continued

confinement bears reasonable relation to the original purpose for commitment. *See Foucha*,

504 U.S. at 77, 79, 112 S. Ct. at 1780, 1785; *Hendricks*, 521 U.S. at 363, 117 S. Ct. at 2083;

*Jones*, 463 U.S. at 368, 103 S. Ct. at 3051–52. The appellate court did not unreasonably apply

these precedents to Petitioner's case. Nor did the appellate court "ignore[] the clear and

convincing weight of the evidence" in crediting Dr. Weitl's diagnostic reasoning, particularly given the lack of evidence suggesting Petitioner no longer had a mental disorder predisposing him to commit sexual violence. *Goudy*, 604 F.3d at 399. Petitioner likewise failed to rebut by clear and convincing evidence that the appellate court unreasonably linked Petitioner's initial jury trial to his continued commitment under a sexual sadism diagnosis. *See* 28 U.S.C. § 2254(e)(1). Finally, as no Supreme Court precedent clearly applies *Brady* to civil commitment proceedings, the appellate court decision regarding withheld evidence was not "contrary to or involve[] an unreasonable application" of clearly established federal law. *Id.* § 2254(d)(1).

As we do not believe any reasonable jurist would come to a different result, we decline to issue a COA.

## CONCLUSION

For the foregoing reasons, we deny Petitioner's petition for writ of habeas corpus. We also decline to issue a certificate of appealability. It is so ordered.

_____
Honorable Marvin E. Asper
United States District Judge

Dated: June 12, 2019
      Chicago, Illinois